## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID F. TYSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:09CV3078 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM AND ORDER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, David F. Tyser, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying his application for disability insurance and Medicare benefits. After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be reversed.

## I.  PROCEDURAL BACKGROUND

On November 8, 2005, plaintiff protectively filed an application for disability insurance and Medicare benefits under Title II and Part A of Title XVIII of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). (Tr. 53-57). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a final decision of the Commissioner of the Social Security Administration under Title II.

Plaintiff's application was denied initially (Tr. 46-49), and on reconsideration (Tr. 42-45). An administrative law judge (ALJ) held a video hearing on April 14, 2008. On August 7, 2008, the ALJ found plaintiff was not under a "disability" as defined in the Act (Tr. 10-21). On February 26, 2009, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 5-8). The decision of the ALJ stands as the final decision of the Commissioner in this matter.

## II.  ISSUES PRESENTED

In order to meet the requirements for "insured status," which is required for Title II benefits, an individual must have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability.  *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130 (2008).  In this case, the alleged onset date is May 1, 1984 and plaintiff's insured status for the purpose of Medicare benefits expired on December 31, 1989.[1]  (Tr. 42).  Accordingly, to receive Title II benefits, plaintiff must show that he became disabled between May 1, 1984 and December 31, 1989.  The ALJ found that plaintiff was not disabled prior to December 31, 1989 and, therefore, not eligible to receive benefits.

The issue presented in this appeal involves the onset date of the plaintiff's disability. This court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g).

## III.  FACTUAL BACKGROUND

The administrative record shows the following.

### A.  Written Records

Plaintiff, who was born June 15, 1949, alleges he became disabled beginning May 1, 1984 due to multiple sclerosis.  (Tr. 53-55 & 88).

Plaintiff obtained a Masters Degree in Agriculture in 1974 (Tr 364-65) and worked as a County Extension Agent.  In April 1984, plaintiff began having problems with unsteady walking, with a tendency to drift off toward the left.  On May 11, 1984, plaintiff's treating physician, Dr. Tom Vinton, found a degree of left hemiparesis and referred plaintiff to a neurologist, Dr. Lewiston W. Birkmann for an evaluation.  (Tr. 153).

---

[1]This point is not contested.

Plaintiff was admitted to the hospital on May 14, 1984 and was observed to have "a definite circumducting gait with some weakness and spasticity observed on the left side." (Tr. 151).  Dr. Birkmann's initial diagnosis was "gradual onset left side hemiparesis of approximately ten days duration, possible demyelinating disease." (Tr. 151).  During his three-day hospital stay, plaintiff's condition gradually improved and he continued to "ambulate somewhat better"; however, plaintiff continued to experience a trace of left sided weakness when he was discharged from the hospital. (Tr. 139-40).  He was not treated with steroids at that time because he had described an improvement over the last two to three days. (Tr. 151-52).  Dr. Birkmann advised plaintiff not to try to work until possibly after May 28, 1984.  (Tr. 245).  He reported to Dr. Vinton that plaintiff's findings were consistent with probable first episode of demyelinating disease.  *Id.*

Dr. Birkmann's May 24, 1984 letter to Dr. Vinton (Tr. 243-44) indicates that plaintiff experienced a worsening of his left side weakness and incoordination within a week after he was discharged from the hospital, possibly due to an increase in activity.  Plaintiff was walking worse, with more of a spastic and circumducting gait on the left side than he had on May 17. He also demonstrated weakness on the left side.  Dr. Birkmann thought this was "a little worsening of his original onset problem," and recommended cautioning plaintiff to take it easy, except for gentle exercises.  Plaintiff was given 60 mg. of Prednisone daily for five days, then reducing to 40 mg. daily.

On June 7, 1984, Dr. Birkmann reported that plaintiff was somewhat better.  He had gotten to the point that he was unable to even wiggle his toes on the left side and could not raise his left arm above his head; however, he could do these things on June 7.  Plaintiff's gait had improved, but he had a mild circumducting quality and some distal foot drop quality. There was a definite improvement, possibly due to the introduction of the Prednisone.  Dr. Birkmann would try to taper the dose of Prednisone over the next three to four weeks and would discontinue it if plaintiff maintained the present progress.  Plaintiff could "gradually increase what he was able to do at work as he wishes, he seems to have a fairly good ability to modify his schedule in this regard."

By letter dated July 23, 1984, Dr. Birkmann reported that plaintiff had not yet been able engage full activities in his work as a County Extension Agent.  He was working two

-3-

to three hours a day, two to three days per week and wondered whether he would be able to ever return fully to his full duties. Plaintiff had tapered off the Prednisone and was gaining some stamina. He still had a little bit of a mild hemiparetic and mildly spastic gait on the left, and it appeared plaintiff was going into a remission phase of his recent demyelinating problem. Dr. Birkmann felt it was important for plaintiff to maintain an active lifestyle and try to increase what he could do on a gradual basis. The doctor was "hard-pressed" to make a solid recommendation as to work and thought the best approach would be to say that plaintiff was temporarily disabled from engaging in his full duties for another two to three months and possibly reevaluate at that time.

On August 30, 1984, plaintiff signed an application for civil service total disability retirement benefits (Tr. 239-40). The accompanying physician's statement, signed by Dr. Birkmann on September 20, 1984, reported that the disability began on May 14, 1984; plaintiff had a history of left numbness, weakness and fatigue; and physical findings of left hemiparesis, spasticity and incoordination. The form asked whether the patient could

do work involving duties which are:  very ☐ LIGHT   ☐ MODERATE   ☐ ARDUOUS?

or, in the alternative, whether he considered the patient to be

totally disabled for any kind of work?   ☒ YES   ☐ NO

Dr. Birkmann responded by writing the word "very" and drawing a line to the "LIGHT" box; however, he unambiguously marked the box on the form indicating that he considered the patient "totally disabled for any kind of work." He also indicated that the total disability was expected to last one year or more. Dr. Birkmann reported his diagnoses as "1) probable demyelinating disease, 2) left hemiparesis secondary to #1, resolving." (Tr. 239-40).

On September 20, 1984, Dr. Birkmann also signed an attending physician's statement for plaintiff's disability insurance carrier. (Tr. 237-38). This form also reflects the diagnosis of demyelinating disease; subjective symptoms of numbness, incoordination and fatigue; and an objective finding of hemiparesis. In response to the questions on the form, Dr. Birkmann

-4-

reported that plaintiff had been treated with Prednisone, his condition was unchanged, the plaintiff was ambulatory (as opposed to being confined to bed, house or hospital) and it was unknown when plaintiff would be able to resume work.  As to physical impairment, Dr. Birkmann checked the box on the form for "moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity. (60-70%)."  His prognosis was that the plaintiff was totally disabled from performing his regular job and from performing all other types of work.  It was unknown whether there would be any significant improvement in the future.  As for rehabilitation, plaintiff's present job could not be modified to allow for handling with impairment, and vocational counseling and/or training would be recommended.  A similar form completed on December 9, 1984, indicated that plaintiff was a suitable candidate for rehabilitation in that his prior job required outside work on his feet, and plaintiff would need more sedentary work.  (Tr. 236).

Plaintiff was examined by Dr. Birkmann, on January 8, 1985.  At that time, plaintiff still complained of "easy fatigability" and an intermittent feeling of numbness on the left side.  The feeling of numbness increased if plaintiff was more active than usual.  Plaintiff's gait was "nearly normal" with a slight circumducting quality on the left.  The spastic appearance was gone, and plaintiff had "essentially normal" strength on the left side.  Dr. Birkmann concluded that plaintiff had a fairly well-documented demyelinating disease, which at that time seemed to be "in remission from the left hemiparetic involvement." Plaintiff was gradually improving, and Dr. Birkmann encouraged him to "increase his activities."  Dr. Birkmann also stated that plaintiff "still would not be able to return to his full-time active work which involved long distances of walking outside," but "may be able to begin thinking of some form of retraining or new type of job" in the next few weeks or months.  (Tr. 235).

On January 31, 1985, Dr. Birkmann reported to plaintiff's insurance company that plaintiff suffered from "demyelinating disease, left side numbness, incoordination, left hemiparesis, resolving."  Plaintiff had been treated with Prednisone, and Dr. Birkmann indicated that plaintiff was totally disabled from performing his regular job and from performing all other types of work.

-5-

Dr. Birkmann examined plaintiff on August 28, 1985, at which time plaintiff again reported "easy fatigability, a little worse on the left." Plaintiff had some transitory vision disturbance in the spring of 1985. He had not returned to work activities. His gait at that time was "absolutely normal" with no weakness on either side, and he appeared to be in a complete remission. (Tr. 233).

On December 27, 1985, Dr. Birkmann was contacted by a rehabilitation specialist, Robert Chaikin, who had seen the plaintiff and wanted Dr. Birkmann to make some additional recommendations regarding plaintiff's possible rehabilitation and work abilities. Dr. Birkmann discussed the case "somewhat" with Mr. Chaikin and noted that he would write Chaikin a separate letter. (Tr. 233).

In a form submitted to plaintiff's insurance company, signed on December 25, 1986, Dr. Birkmann reported the diagnosis of multiple sclerosis and once again indicated that the plaintiff was totally disabled from performing his work and had been totally disabled since May 1984. His "physical impairment (*As defined in Federal Dictionary of Occupational Titles)" was designated as either Class 3 (slight limitations of functional capacity; capable of light work) or Class 4 (moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity). Dr. Birkmann reported that, mentally, plaintiff would be able to function in most stress situations and engage in most interpersonal relations. Plaintiff had a "slight limitation" in cardiac functional capacity. As to rehabilitation, Dr. Birkmann reported that plaintiff was a suitable candidate "for further rehabilitation services (ie. cardiopulmonary program, speech therapy, etc.)." His present job could not be "modified to allow for handling with impairment," in that plaintiff could not do field work, and "vocational counseling and/or retraining" would be recommended. (Tr. 232).

Dr. Birkmann's August 12, 1987 letter to the plaintiff states, "I do still feel that you are disabled from the full aspects of your prior employment. As before, I think that you could do many other types of activities, but probably not the outdoor, hot, strenuous aspects of the previous field work." (Tr. 231).

Plaintiff was seen by Dr. Steven R. Thomas at the York Medical Clinic on September 1, 1989. Dr. Thomas reported the following to plaintiff's disability insurance carrier:

-6-

> [Plaintiff] was in today for a health maintenance examination.  Basically he's
> been doing about as well as could be expected.  During the hot summer
> weather he had several exacerbations where he was unable to walk because of
> a gait disturbance, generalized muscular weakness and some visual
> impairment.  He could feel these coming on.  He usually aborts them by going
> to bed for several days, usually two or three.  When his strength returns he
> slowly works back into his usual activities.  He's had no loss of bowel
> function.  No loss of bladder function.  No major change in his visual acuity
> although his eyes do fatigue easily when he's having an exacerbation.
> Mentally he's been doing well although he does become depressed from time
> to time, rightfully so.  He talked to me today about various therapeutic
> modalities and we both agreed that at the present time we are not going to use
> any drugs.  We will save them for major exacerbations that he might have.
> He's had no change in hearing or voice.  No SOB or palpitations.  No chest
> pain to speak of except in that left pectoralis area.  No indigestion or upset
> stomach.  No bowel dysfunction.  No bladder dysfunction.  No skin changes
> of note.  He's appropriate in affect today and appears cheerful.
>
> . . . .  Neurologically he was okay today.  He lacks a little in muscular strength
> but otherwise he's doing well.
>
> IMP.:  Multiple sclerosis, in remission at the present time.  It is a chronic
> exacerbating type though and we are going to save the big guns for when he
> has problems in the future.

(Tr. 158).  Dr. Thomas further indicated that the nature of plaintiff's treatment involved
"frequent bedrest, no medications at present"; that plaintiff was totally disabled from
performing his work or business; it was unknown when the plaintiff would be able to
perform his work duties; and plaintiff had retrogressed.  Dr. Thomas designated plaintiff's
"physical impairment (*As defined in Federal Dictionary of Occupational Titles)" as Class
3 (slight limitation of functional capacity; capable of light work).  The doctor checked the
box on the form indicating that plaintiff was a suitable candidate for rehabilitation, but
explained that plaintiff had several occurrences of weakness and fatigue in the past year,
causing him to be limited to bedrest for several days.  (Tr. 1156-159).

The record does not disclose any additional treatment or evaluation prior to December
31, 1989, nor during the four years following.  Dr. Thomas evaluated the plaintiff in

-7-

November 1995 and, on March 14, 1996, completed an insurance questionnaire noting that Plaintiff "had a rocky winter with a fair amount of time spent at bed rest because of fatigue and muscle weakness typical of the relapsing nature of his underlying disorder." (Tr. 161). A similar statement was submitted by Dr. Thomas on April 27, 1998 (Tr. 160). Nearly all of the medical records filed in this case, from 1984 through 2008, reflect the plaintiff's complaints of chronic fatigue and need for bedrest.

Dr. Birkmann's July 15, 2008 letter to plaintiff's counsel advises that plaintiff had significant multiple sclerosis, relapsing/remitting variety, and has significant difficulty ambulating at times. Dr. Birkmann stated: "His impairment/disability has actually begun as long ago as his original diagnosis in 1984. He has definitely worsened throughout the interval since then, and of course his impairment is expected to last indefinitely." Dr. Birkmann did not believe plaintiff could engage in substantial gainful activity, "partly from the standpoint of stamina and general strength in the legs, and also partly from the standpoint of significant incoordination he has related to the disease." (Tr. 349). On September 26, 2008, Dr. Birkmann provided a signed statement that plaintiff's disability, impairments, and limitations "were sufficient enough between 1984 and 1989 to render him disabled and unemployable in the national economy during that period of time." (Tr. 357).

**B. Hearing Transcript**

The ALJ began the April 14, 2008 video hearing by questioning the plaintiff's motive for applying for Social Security benefits some 20 years after the alleged onset of disability. (Tr. 363, 373). Plaintiff explained:

> Well, when I was first diagnosed with MS I really enjoyed my job there as an extension agent and I wanted to get back into it and I figured if at all possible if I take a few years off, take care of my health, try to do what the doctor says, I was hoping that I'd be able to regain enough that I could get back to work. I know that maybe is a little foolish, maybe I was being more optimistic than I should have been but I figured, you know, I've beaten other diseases, the normal kid diseases most measles et cetera and I thought if I take off about three years and rest up I could get back into the workforce. Well, I gave it the three years. I was still having trouble with the neurological fatigue but I thought, well. I'd give it another shot and try it for about two more years and

-8-

at that time there were several new drugs coming out and I was hoping that some of those might give me relief but as I tried some of them and some of them caused liver problems and I couldn't ... continue on them. [The] drugs themselves don't cure MS, they just ... help you get by with some of the symptoms and lessen the relapses and so I've ... just tried to maintain my health and with the hopes that I would someday be healthy enough to work again but now I'm having more mental problems and pooling my thoughts and organizing things and so I'm basically saying that I don't think I'll ever be able to work.

(Tr. 373-74).  Regarding the fatigue he had experienced, plaintiff testified:

[M]y biggest problem with the MS is the fatigue and in my opinion there are several different kinds of fatigue. There's emotional fatigue and mental fatigue and physical fatigue. Mental is also the neurological fatigue associated with the MS. This is a little different than the average fatigues in that it comes on as overpowering and one minute you can be feeling good and the next minute you're ready to lay down and so because of this fatigue, the neurological fatigue any of the jobs that I looked into I, I didn't pursue because I knew I wouldn't be able to be employed at them full-time.

(Tr. 372-73).  Plaintiff stated that the neurological fatigue tends to worsen the other types of fatigue, and he has to rest once an episode of fatigue begins.  (Tr. 378).

When asked if he would care to comment on Dr. Birkmann's comments about the MS being in "total remission," plaintiff testified:

I always try to look good for the doctor and I don't know, I guess, you know, we did discuss some of the problems that I was having at the time, you know, new ones that would come up and then dissipate and then reappear. I think he put a lot of emphasis on my walking and my gait and I do walk well, I do walk well and [am] happy for it ...

(Tr. 375).  In response to the ALJ's question whether he could have done sedentary work, plaintiff responded that he could do a lot of things, "maybe for a day, maybe for two days, maybe even a little more out of the week," but he did not think he could have put in a 40-hour week because of the fatigue factor.  (Tr. 375).

-9-

Plaintiff acknowledged that he had periods of remission, but he has always relapsed. His longest period of remission lasted about three months; however, he always retrogressed to the condition he was in May 1984, or worse. Plaintiff testified that his condition slowly became worse between 1984 and 1989, particularly with fatigue, muscle stiffness, weakness, and constant pain. (Tr. 378). He has had these problems for 24 years. He stated he did not think he could have worked as a county extension agent or worked a 35 to 40-hour week and been substantially gainfully employed in another job during 1984 through 1989. Plaintiff acknowledged he walked well for someone who has been diagnosed as having MS, because some are in wheelchairs. He testified his walking was somewhat unstable, and he sometimes wobbled or lost his balance.

Vocational Expert (VE) Anita Howell testified in response to three hypothetical question posed by the ALJ. The first question assumed that the plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds; stand, sit or walk for six hours in an eight-hour day; occasionally do postural activities, climb, balance, stoop, kneel, crouch, crawl; was precluded from his past work; and should avoid working in concentrated heat. The VE testified that plaintiff would have transferable skills to both light or sedentary work but could perform jobs such as administrative clerk, shipping order clerk, and front desk clerk. Eliminating the work that would require being outside in the heat,  approximately 90 percent of the jobs existing in the local, regional, and national economies would be retained. (Tr. 382-83).

The second question assumed plaintiff needed a job where lifting was not greater than 10 pounds on an occasional or frequent basis; he was primarily working at a desk or a seated position; he could sit for six hours and stand or walk for two hours out of an eight-hour workday; he could occasionally do postural activities and needed to avoid concentrated exposure to heat or working out of doors.  The VE testified that 95 percent of the semi-skilled, sedentary jobs identified previously would be retained. The semi-skilled jobs included information clerk or appointment clerk.  Unskilled jobs included charge account clerk and order clerk.  (Tr. 384-85).

In the third question, the VE was asked, assuming that the plaintiff's testimony about his symptoms and their severity was credible, whether the plaintiff could have done these

-10-

unskilled or semi-skilled light and sedentary jobs during the relevant time period.   The vocational expert testified:

> Based on his testimony I would say no and my rationale is that the fatigue he described and the need for rest and a nap on a daily basis plus the periods of remission and then relapse he would not be able to hold any of the jobs I identified or any other gainful work over a lengthy period of time.

(Tr. 386).

### C.  ALJ'S Decision (Tr. 13-21)

The ALJ applied the mandatory five-step sequential evaluation process[2] to decide whether the plaintiff was disabled prior to December 31, 1989.  *See* 20 C.F.R. § 404.1520(a).

The ALJ made the following findings:

**Step 1.**  Plaintiff did not engage in "substantial gainful activity," *see* 20 C.F.R. § 404.1572, between May 1, 1984 through December 31, 1989.

**Step 2.**  Plaintiff had the severe impairment of multiple sclerosis from May 1, 1984 through December 31, 1989.

**Step 3.**   Through December 31, 1989, plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2]In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering:

> 1) whether the claimant is presently engaged in a "substantial gainful activity;" 2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; 3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations ...; 4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and 5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (quoting *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir.1998)).

-11-

**Step 4.** Through December 31, 1989, plaintiff did have the residual functional capacity to perform sedentary work, except that he could stoop, kneel, crouch, crawl, bend, and squat only occasionally. Plaintiff must also avoid work where he would be exposed to extreme heat and work that is performed outdoors.

**Step 5.** Through December 31, 1989, plaintiff was unable to perform his past relevant work; however, considering plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment.[3]

## IV. LEGAL ANALYSIS

### A. Standard of Review

In the August 7, 2008 decision (Tr. 13-21), the ALJ found that the plaintiff was not entitled to disability benefits because was not under a disability within the meaning of the Social Security Act from May 1, 1984 through December 31, 1989. This decision, which stands as the final decision of the Commissioner, must be affirmed if it is supported by substantial evidence in the record as a whole. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" *Id.* (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). The court must consider the entire record, including

---

[3]The record contains a "PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT" form (RFC) (Tr. 131-138) completed by a medical consultant, Dr. Grossman on or about March 29, 2006. It appears that this document was prepared based on a review of the medical evidence of record (MER). The consultant did not examine or interview the plaintiff, and the RFC contains only a vague reference to "MER" and does not indicate which records were actually reviewed. The actual state of the MER as of March 29, 2006 is unclear to the court. The consultant acknowledged there was a diagnosis of multiple sclerosis prior to 1989, and the plaintiff did have credible MS symptoms prior to December 31, 1989. According to the consultant, however, the MER indicated that plaintiff's impairment "remitted," and plaintiff should have had the ability for work activity that did not require heavy lifting and overexposure to heat on and prior to December 1989.

evidence that supports as well as detracts from the Commissioner's decision.  The court cannot reverse the Commissioner's decision simply because some evidence may support the opposite conclusion.  *Id.  See also Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008); *McEvers v. Astrue*, 518 F. Supp. 2d 1071 (S.D. Iowa 2007).

## B.  Discussion

To establish entitlement to benefits based on disability, Plaintiff must show he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. § 1382c(a)(3)(A).  In this case, plaintiff must establish the existence of a disability on or before the expiration of his insured status on December 31, 1989.  *See Schulte v. Astrue*, — F. Supp. 2d —, 2010 WL 670559 at *7, Case No. 4:08CV1652 (E.D. Mo. Feb 19, 2010) (citing *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984)).  Medical evidence of plaintiff's condition after December 31, 1989 is relevant evidence because it may bear upon the severity of his condition before the expiration of his insured status.  *See id.*  "However, '[a] nondisabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II.'"  Id. (quoting *Stanfield v. Chater*, 970 F. Supp. 1440, 1456 (E.D. Mo. 1997)).

Basically, plaintiff contends the ALJ's findings to the contrary are not supported by substantial evidence in the record as a whole, because the portions of the record the ALJ cited to discredit the plaintiff's testimony and physicians' opinions are "more than outweighed by the documentation that supports his testimony and in turn makes Mr. Tyser's testimony very credible."  (Doc. 14, Plaintiff's Brief at p. 8).

In determining the time of onset for "disabilities of nontraumatic origin," the Social Security Administration itself has observed,

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and

adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began. ....

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

\* \* \* \*

The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

Social Security Ruling (SSR) 83-20, 1983 WL 31249 at \*2-3 (SSA).[4] *See also Davis v. Astrue*, 2008 WL 130778 at \*2, Case No. 06-4106 (N.D. Iowa Jan. 15, 2008).

On the issue of credibility, the ALJ may discount a claimant's subjective complaints if they are inconsistent with the evidence as a whole, but the ALJ must make express credibility determinations and set forth the inconsistencies in the record. *Schulte v. Astrue*, — F. Supp. 2d —, 2010 WL 670559 at \*6, Case No. 4:08CV1652 (E.D. Mo. Feb 19, 2010). "It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence." *Id.*

---

[4]"Once published, Social Security Rulings are 'binding on all components of the Social Security Administration.'" *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997) (quoting 20 C.F.R. § 422.406(b)(1) (1996); & citing *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984)).

Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure and which is subject to periods of remission and exacerbation. *See, e.g., Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). While multiple sclerosis is not *per se* disabling, the ALJ in evaluating a claimant with MS must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox*, 917 F.2d at 277. Since at least 1984, the Social Security regulations have recognize that "[i]n conditions which are episodic in character, such as multiple sclerosis ... consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, § 11.00(D). Thus, "'[w]hen a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission from the disease to determine whether the claimant has the ability to engage in substantial gainful employment.'" *Hopkins v. Commissioner of Social Sec.*, 2009 WL 1360222 at *16, Case No. 1:07-cv-964 (S.D. Ohio May 14, 2009) (quoting *Jones v. Secretary of HHS*, 35 F.3d 566 (6th Cir. 1994) (unpublished)).

In this case, the court finds that the ALJ failed to consider the progressive nature of plaintiff's incurable disease and improperly focused on periods of remission. While the ALJ discredited plaintiff's complaints of fatigue because they were not discussed in detail in forms completed by Dr. Birkmann, nearly every medical record filed in this case, from 1984 through 2008, mentions that the plaintiff was complaining of fatigue. The evidence is uncontroverted that the plaintiff could never return to work as a county extension agent due to the symptoms of his multiple sclerosis. Every treating physician's record submitted to the ALJ in this case unambiguously states that the plaintiff was totally disabled for purposes of engaging in full-time employment. In the context of the diagnosis, it was not "inconsistent" for the various physicians to report to plaintiff's disability insurer that the plaintiff was totally disabled but was a suitable candidate for rehabilitation. Dr. Birkmann did discuss the possibility of rehabilitation with rehabilitation specialist, Robert Chaikin.

Considering the nature of the disease, it might have become possible for the plaintiff to pursue sedentary employment of some sort, but that possibility did not materialize. Plaintiff acknowledged that he had periods of remission, but the longest period of remission lasted only three months and he always retrogressed to the condition he was in May 1984,

-15-

or worse.  The ALJ discredited plaintiff's testimony because he was not taking medications. The record, however, demonstrates that Prednisone was the only medication available at that time to treat the symptoms of multiple sclerosis.  Plaintiff did, in fact, take a course of Prednisone in the summer of 1984.  An insurance form (Tr. 234) completed by Dr. Birkmann indicates that plaintiff was treated with Prednisone in January 1985.

While some of the earlier medical reports state that plaintiff was in remission, Dr. Thomas reported in September 1989 that plaintiff had retrogressed (Tr. 157) and needed frequent bedrest.  (Tr. 156).  No medications were prescribed at that time because, considering the nature of plaintiff's multiple sclerosis, it was deemed necessary to "save the big guns for when he has problems in the future."

The plaintiff's testimony and medical records cannot be discredited on the grounds articulated in the ALJ's written decision, and the court finds that the ALJ's credibility determinations are not supported by substantial evidence in the record as a whole.  Based on the plaintiff's testimony, the VE opined that plaintiff could not have  performed unskilled or semi-skilled light and sedentary jobs from the onset date through December 31, 1989, due to plaintiff's fatigue, need for rest and a nap on a daily basis, and the periods of remission and relapse.  (Tr. 386).[5]  Dr. Birkmann has provided a signed statement that plaintiff's disability, impairments, and limitations "were sufficient enough between 1984 and 1989 to render him disabled and unemployable in the national economy during that period of time."  That statement is consistent with Dr. Birkmann's prior reports, generated between 1984 and 1989, that the plaintiff was totally disabled.

Based on the evidence of record, and considering the record as a whole, the court finds that plaintiff's impairment was sufficiently severe to prevent him from engaging in substantial gainful activity prior to December 31, 1989.

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing.  42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay

---

[5]This opinion was completely omitted from the ALJ's written decision.

-16-

receipt of benefits," an immediate order granting benefits without remand is appropriate. *Davis v. Astrue*, 2008 WL 130778 at *5 (citing *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991).

Accordingly, the decision of the Commissioner is reversed, judgment will be entered for the plaintiff, David F. Tyser, and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits, with a disability onset date of May 1, 1984.

**IT IS SO ORDERED.**

**DATED June 17, 2010.**

BY THE COURT:

s/ F.A. Gossett
United States Magistrate Judge

-17-